Lex. L. F. & M.
Ins. Co. &c.
*vs.*
Page & Rich
ardson.

Case 44.

# Lexington Life, Fire and Marine Insurance Company, &c. *vs.* Page & Richardson.

Pet. Eq.

APPEAL FROM FAYETTE CIRCUIT.

1. A stockholder in a corporation may deal with the company as an individual, and become a creditor as any other individual, and may be secured as a preferred creditor in an assignment by the corporation, without, on that account, incurring the imputation of fraud.

2. A corporation is not justifiable in treating as profits, subject to be divided, premiums received upon unexpired risks, when it had not a fund sufficient, independent thereof, to meet all liabilities that might accrue on the pending risks. (6 *Paige*, 486; 7 *Ib.* 198.) And dividends thus made may be reclaimed by the corporation.

3. Dividends declared by the directors, and received by the stockholders, may be reclaimed by the directors, if illegally declared under a misapprehension of the right to declare them; and if there be an assignment by the corporation to a trustee, such right to reclaim dividends improperly declared and paid passes to the assignee, if the terms of the assignment are sufficiently comprehensive to embrace them.

4. Express continuing trusts, which are exclusively cognizable in chancery, are not embraced by the statute of limitations; but where there is a legal responsibility, and a trust by implication, the statute may be relied on with effect. (*Dudley vs. Price's adm'r*, 10 *B. Monroe*, 84; 3 *J. C. R.* 216; 5 *Ib.* 531; 12 *Vez.* 87; *Story's Eq.*, sec. 1252; 7 *J. C. R.* 89; 5 *Dana*, 199; 16 *Searg. & Rawle*, 379.)

5. Beneficiaries in a deed of trust, having funds of the assignor in their hands, may retain, so far as is necessary to secure them for advances made, or personal liabilities incurred, as agent of the assignor, and liabilities incurred before notice of the assignment.

[The facts of the case appear in the opinion of the court.—Rep.]

*W. A. Dudley* and *George Robertson* for appellants—

The appellees claim to be creditors of the Insurance Company to a large amount. They ask, by their petition, that the assignment of the effects of the company to Buckner may be set aside, as fraudulent; but if that cannot be done, that the directors who declared, and the stockholders who received di-

vidends, which they charge to have been illegally declared, may be decreed to refund them in satisfaction of their demand. The assignee, directors, and stockholders were made defendants. By an amended petition it is alledged that they had not discovered that the dividends were illegally declared until within five years before suit was brought. By another amended petition they alledge the insolveucy of the company. A demurrer was filed to the bill by each class of defendants, separately, which was overruled.

In support of the demurrer it is urged, 1. That the plaintiffs are not in a condition to question the rights of stockholders to dividends paid to them by order of the directory. 2. Having no judgment at law and return of "no property" on an execution.

This rule is well settled by a series of adjudications. (1 *Vern.*, 399; 1 *Pierre Wms.*, 445; 3 *Atkyns*, 200; 8 *East.*, 467; 6 *Vez.*, 786; 4 *Johnson's Ch. Rep.*, 687; 2 *Ib.*, 144; 4 *Ib.*, 671; 4 *Monroe*, 480; 2 *J. J. Marshall*, 135; 4 *Dana*, 23.) The statute of Kentucky, of 1821, recognizes the principle, and so does the Code of Practice, section 474.

The circuit judge seemed to entertain the idea that by the assignment the corporation was dissolved, which is contradicted by the following authorities. (*Dudley vs. Price*, 10 *B. Monroe;* 24 *Pick.* 49; 6 *Gill & Johnson*, 205; 15 *Pick.* 351; 3 *Desaus.* 537.)

It is contended, however, that the capital stock of the company is a trust fund for the benefit of creditors, which would of itself give a court of equity jurisdiction, and *Woods vs. Dummer*, 3 *Mason*, 308, is relied on. That was a case in which the stockholders themselves divided out the capital stock of the company; and the object was to compel payment of a debt due by the bank, and there was no demurrer to the bill; had there been, said Judge Story, "it would have been difficult to have strained hard enough to support it." Moreover, the corporation was not a party to the suit, and it appeared from its

Lex. L. F. & M.
Ins. Co. &c.
vs.
Page & Rich-
ardson.

charter, which was part of the bill, that the corpora-
tion had expired by the terms of the charter, before
the suit was commenced, [3 *Mason*, 317] and had then
no existence. They rely on the case of *Brinkerhoofe
vs. Brown*, 4 *Johnson's C. R.*, 671, to show a right to
maintain this suit.

If there be any trust the corporation is the trustee,
and if the capital of the corporation is technically a
trust fund, the claims of any creditor upon them is
properly cognizable in a court of equity. But it has
never been contended that on this ground claims
against corporations were cognizable in a court of
equity. Corporations hold their funds as individu-
als, and liable in the same way, and before the same
jurisdictions.

The claim of the appellees is, first, that the con-
veyance to the trustee is fraudulent; secondly, the
call for an enforcement of the trust confided to the
trustee. These claims are repugnant, and this is
ground of demurrer. (2 *Vez. jr.*, 696; *Story's Eq.*,
*Chap.* 30, *passim.*) No man can claim under a deed
or will without conforming to it. (3 *Bro. C. C.*, 286,
*and notes.*) In this case the appellees first charge the
assignment to be fraudulent; secondly, claim under
the assignment; thirdly, claim a part of the divi-
dends as part of the trust fund to which they claim
to be entitled; and fourthly, that the dividends pass-
ed to the assignee, and that he has a right to reclaim
them, and ask a personal decree against him if he
fails to do so.

Four main questions arise in the case. 1. Was
the assignment to Buckner fraudulent? 2. Were
the dividends illegally declared? 3. If illegally de-
clared, with whom is the right to reclaim them, if it
exists? 4. Is the statute of limitations an available
bar to their recovery, if paid more than five years
before the institution of this suit?

1. The charge of fraud is not sustained. It is said
that some of those who received the dividends which
were illegally declared, are among the preferred

creditors, by the assignment. The fact is admitted; but it clearly appears from the facts in the case, that the claims for which they were preferred had no connection whatever with the dividends received, but given for money and credit actually advanced to the corporation to sustain its credit in 1851, when necessary to its existence; and the fund so raised was actually used in payment to the general creditors of the company. This embarrassed condition of the company was the result of unfaithfulness on the part of agents, and amongst them the plaintiffs themselves, in theretofore reporting an amount of available funds on hand which was not true. Hence the plaintiffs were made to occupy a place in the third class, as to payment. The record shows that, independently of the sums for which preference is given to stockholders for advances made to the corporation, the stockholders have sustained a loss of upwards of seventy thousand dollars, for which there is no security whatever, in the assignment.

LEX. L. F. & M.
INS. CO. &c.
vs.
PAGE & RICH-
ARDSON.

2. Were the dividends illegally declared?

The record shows that when dividends were declared, a large proportion of the assets of the company consisted of promissory notes due from individuals, for premiums on risks yet unexpired. It is now insisted for the appellants, that the directory had a right to treat these notes as available assets, and they should still be regarded in that light, until it is made to appear otherwise. These notes may have been good and available when the dividends were declared, and if they subsequently became unavailable, it cannot render the act of declaring a dividend illegal.

As to the impairment of the capital stock, by the substitution of premium notes for the notes of the stockholders, reference is made to the 8th section of the act of incorporation, of 1835–'6, expressly authorizing the directors to loan the funds of the company, not permanently invested, and take notes therefor.

The right to declare dividends on premium notes, where the risks had not expired, is asserted by the appellants. Without such right no company could declare a dividend until it had ceased to insure, and all its policies had expired. The whole capital stock of the company is the fund which is bound to satisfy the risks taken, and not the premium notes for the particular, or any particular, case.

But it is contended for appellees, that before making a dividend, the company are not bound to set apart from the assets a sum sufficient to reinsure, at current rates, all unexpired risks. This would doubtless be good *policy*, but was it a *duty*, and had the directory the power? The reservation contended for is in the nature of a contingent fund. The charter does not require that any contingent fund be set apart. Moreover, such a contingent fund could not, in all cases, protect the policy holders against all outstanding risks, if the company had been required, by its charter, "to reserve a contingent fund sufficient to cover probable losses," but there is no such requisition in the charter, and the company was not bound to reserve any fund beyond its capital stock, to cover outstanding policies, to their utmost extent.

The 7th section of the charter fixes certain periods at which the president and directors may "declare dividends of so much of the profits of the corporation as may to them seem advisable." The object of which provision, no doubt, was to prevent the directory from taking advantage of probable apparent, but doubtful prosperity, to divide profits to the prejudice of third parties. It next provides, "that in case of any loss, by which the capital stock of the corporation shall be impaired or lessened, no subsequent dividend shall be made until a sum equal to such diminution, and arising from the profits of the corporation, shall have been added to the capital."

3. If the dividends were illegally declared, who has the right to reclaim them? This question is de-

cided by this court, in the case of *Gratz vs. Redd*, 4
*B. Monroe*, 178. As the right was in the corporation,
so is it transferred to the assignee. The appellees,
in their amended petition, alledge that it did so pass,
and ask a personal decree against him for the
amount, if he fails to collect them. The granting
clause in the deed is sufficiently comprehensive to
embrace it, and parol proof is incompetent to show
a different intention from that appearing on the face
of the deed. *Bayard vs. Hoffman*, 4 *John. Ch. Rep.*,
450, is an authority to this point.

It is proper in this connection to speak of the right
of the stockholders, to set off debts due them by the
company, against claims for dividends illegally re-
ceived. If the right to reclaim those dividends pass-
ed to the assignee, no claim acquired after its execu-
tion can defeat that right. The depositing of the
deed of assignment for record, is notice to all the
world of the assignment, sufficient to put all on their
guard and inquiry. On the other hand, a creditor,
whose claim is prior in point of time to the assign-
ment, is entitled to set-off his claim against that of
the company or its assignee, for dividends illegally
received.

4. The statute of limitations is relied on as bar to
the recovery of all such dividends as were received
more than five years before suit brought. The cir-
cuit court denied its application, on the ground that
the corporate fund was a *trust fund in the hands of the
stockholders, for the benefit of creditors.* The directors
may be regarded as trustees, but the stockholders
are not so regarded and treated. If a stockholder
illegally receive the funds of a corporation, the law
implies a promise to refund it; and an execution
creditor may enforce that promise in his favor, by
being substituted to the rights of the corporation.
There is no privity between him and the debtor of
his debtor. In *Hays vs. New Baltimore Co., supra,*
Judge Spencer said: " It has never been held or

Lex. L. F. & M.
Ins. Co. &c.
vs.
Page & Rich-
ardson.

supposed that a debtor is a trustee for his creditors' creditor."

In the cases of *Dudley vs. Price*, 10 *B. Monroe, supra*, and *Railroad Co. vs. Bridges*, 7 *Ib.*, the stockholders were allowed to avail themselves of the protection of limitation. In *Talbot vs. Todd*, 5 *Dana*, 199, the court said, "that the trusts which are not to be affected by the statutes, in courts of equity, are those continuing and abiding trusts which are not at all cognizable at law, but fall within the proper, peculiar, and exclusive jurisdiction of courts of chancery." The same principle is recognized and announced in *Breckinridge vs. Churchill*, 3 *J. J. Mar.*, 14; *Frame vs. Kinney*, 2 *A. K. Marshall*, 146; *Turner vs. Debel, Ib.*, 84; *Thomas vs. White*, 3 *Litt.*, 184; *Finnie vs. Cochrane*, 1 *Watts & Searg.*, 112; *Kane vs. Bloodgood*, 7 *John. Ch. Rep.*, ——; *Lyon vs. McKay*, 1 *Watts*, 275; *Ib.*, 120; 4 *Wash. C. C. R.*, 131; 16 *Searg. & Rawle*, 379; 2 *Story Eq.*, sec. 15, 21; *Lockey vs. Lockey, Pr. Chy.*, 578; *Mad. Chy.*, 354; *Angel on Lien*, 354; *Fonblancque Eq.*, 1 *book, ch.* 4, sec. 27, *and notes*. Direct trusts are such as are created by the act of the parties. "Possible, eventual, or resulting trusts occur where a party, who took possession in his own right, and was *prima facie* the owner, is afterwards converted into a trustee by evidence. In these latter cases it has never been doubted that length of possession would be a bar, on the principle of the statute of limitations." (*Deconche vs. Savitier*, 3 *John. Ch. Rep.*, 216; *Costa vs. Murry*, 5 *Ib.*, 531; *Gist vs. Cattel, Desau.*, 53; *Hunter's executor vs. Spottswood*, 1 *Wash., C. C. R.*, 146; *Beckford vs. Wade*, 12 *Vez.*, 87 to 97.)

In cases of direct trust there is no adversary possession. The possession of the trustee is consistent with the title and right of possession, and therefore no length of possession will bar the right of the *cestui que trust*. But if the possession becomes actually adverse and so continue, the statute will bar the right of the *cestui que trust*. (14 *Searg. & R.*, 394;

4 *Yerger*, 104; 4 *Mason*, *C. C. R.*, 152.) And if a party is to be made a trustee by evidence, his possession is adverse, and the statute may avail as a bar. (*Hovender vs. Ld Annesly*, 2 *Sch. & Laf.*, 607.)

Of the dividends which are charged to be illegal, some were paid in cash, others credited on stock notes, which have been long since paid in full. It is said that the limitation cannot be applied to any but the cash receipts. This is denied; it is as much a payment as the other, in legal contemplation.

The amount which the circuit judge allowed to appellees is greater than they have shown themselves entitled to retain, if they are entitled to any part of the fund, which is denied by the pleadings.

*M. C. Johnson* on same side—

Positions assumed in argument:

I. That the dividends are not illegal, because the capital of $300,000 is unimpaired, and it is that capital which is pledged to the creditors.

II. Plaintiffs have no right to sue.

1. Because the liability of corporations, and their corporate funds, being legal, and not equitable, judgment and execution should have been obtained.

2. The corporate funds being *quasi* trust funds, does not authorize a suit in equity until legal remedies are exhausted.

3. The corporation is not dissolved for any purpose. (See *Portland Dry Dock and Insurance Co. vs. Trustees of Portland*, 12 *B. Monroe*, 78.)

4. An allegation of insolvency not equivalent to alledging no property.

III. If dividends are illegal, who has the right of suit?

The corporation can sue, because the *legal right* of the corporation to the money composing their capital cannot be impaired by an illegal dividend. All persons having the legal title to money in another's hands may sue at law for it. Creditors can reach it, because it is a fund still belonging to the company

the attempt at transfer, by paying as a dividend, being illegal.

IV. How far corporate funds are trust funds.

The trust is cognizable at law, and has always been cognizable at law. By common law, corporations have always been sueable at law, and judgments against them enforceable by writs of *fi. fa.*, distringas and mandamus remedies more efficient than against *natural* persons.

Wholly unlike the trusts which are confidences not regarded at law, and only enforceable in equitiy, all the trusts and duties devolving on a corporation are recognized at law, and chancery only comes in to aid courts at law.

V. Who is the *Trustee?*

Evidently the corporation, and not the stockholder. The corporation has the *legal title*—the stockholder has merely an interest in the profits. The creditor's claim upon the *capital* is paramount on the capital to that of the stockholder.

The *profits*, when legally declared as dividends, belong absolutely to the stockholders as their private property, unaffected by the claims of creditors.

When dividends are *as* of profits, when, however, there were no profits in fact, the stockholder receives and holds and claims them, not as corporate or trust funds, but as individual funds. Consequently he holds *adversely* to all the world, including the corporation.

No contract with government, by the stockholder, as argued by Mr. Pindell, by his subscription he parts with so much money as he subscribes—vests the right of that money in the corporation, to be managed according to the charter. He parts with the *title and possession* of the funds, instead of agreeing to hold them.

VI. The offsets claimed by stockholders.

The offsets are debts due by the corporation, which debts had a claim in all respects equal to that of the plaintiffs.

The stockholders are not in a position forbidding them to trade in any manner with the corporation exactly as strangers.

The case of executors and trustees who are clothed with the *legal title and management* of funds for particular objects are forbidden, upon general principles of law, from trading, for their *profit*, with either the funds or the objects of their trust.

If the debts against the corporation are legal and valid, the only persons having a right to complain of the smallness of the price paid, are the persons from whom bought. What matters it to the plaintiffs who are the owners of these debts, or how much was paid for them, if they are of equal validity with their own debt, and have gained a priority over the plaintiffs, either by offset or otherwise?

The holder of a debt, though he bought it for five cents in the dollar, could bring the same suit the plaintiffs have brought, and no objection could be made on account of the price paid.

No one can object to the inadequacy of consideration but those injured by it.

If the dividends passed to the assignee, R. A. Buckner, still the offsets will be good against the claim of Buckner, because of the want of notice of the transfer.

Most of those purchasing the offsets had heard that the company had made an assignment, but had not heard that the right of recovering these dividends was transferred.

They had no right to suppose that they were transferred, for the directors, who made the assignment, swear that they did not intend to transfer this claim, and of course did not know that it was transferred.

A person owing a debt, which is undisputed, to a man who has failed and made an assignment, should be charged with notice if he had heard of the failure and assignment, because in such cases it is usual to include all undisputed claims in an assignment.

But where there is merely a possible liability, not claimed by the insolvent as a liability at the time of the assignment, there is no presumption that such a liability, *unclaimed*, has been assigned. It is not usual for persons to assign what they do not believe to be due to them.

The stockholders purchased these offsets as a precaution against possible claims of creditors, and as a means of buying their peace, not believing any legal claim existed against them, or that any claim had been made, or had been assigned to the assignee, but to prevent any claim being set up.

VII. Statute of limitations.

1. Does it apply to the claim *to recover these dividends?*

It does, whether regarded as trust funds or corporate funds. The statute applies, in cases of trust, in all cases except where there is a *continuing* trust, without any adverse holding or denial of right. Here the stockholders hold the property as their own, not as trust or corporate funds, and consequently adversely to all the world.

Entirely different from the case in *Wood vs. Dummer, &c* , 3 *Mason*, in which case capital was divided as capital, and consequently no adverse holding.

So decided by this court, in *Bridges vs. Lexington Railroad*, 7 *B. Monroe*.

2. When did the statute commence to run?

When the dividends were paid. The adverse holding then commenced against the corporation's right. That right was immediate—not in abeyance, or in reversion.

The right of the plaintiffs only accrues through the corporation, and subsequently to the declaration of dividends; so whatever time bars the corporation will bar the plaintiffs.

In the case of *Bridges vs. Lexington Railroad Company*, 7 *B. Monroe*, the debt of Bridges accrued long after the declaration of dividends, and within five years of the bringing of suit.

Like the case of *choses in action* sued for on a judgment execution and return of *nulla bona*, the statute begins to run, not from the time of the accrual of the creditor's cause of action, but from the time the *chose in action* became due.

Lex. L. F. & M. Ins. Co. &c. *vs.* Page & Richardson.

*H. C. Pindell* for appellees—

This suit is brought by the Boston agents of the Lexington Fire, Life and Marine Insurance Company, claiming a balance due them on account of $20,-718 68, for advances made by them in the payment of losses, and for commissions. The account is fully proved, and its correctness not controverted.

The object of the petition is two-fold.

1. It submits to the court the validity of the assignment made by the company of its assets and effects to R. A. Buckner; charges that it is fraudulent, and prays that it be so declared, and that the assigned effects be subjected to plaintiffs' demands; but if it be adjudged valid, any benefits to which they may be entitled be secured to them according to the provisions of the deed.

2. It is charged that dividends were improperly declared when there was not any profit out of which dividends could be declared; that it was a dividend of the capital stock; and praying that the stockholders be compelled to refund so much as may be necessary to satisfy the claim of plaintiffs, unless it be the opinion of the court that the right to reclaim such dividends passed to the assignee by the assignment. And in that case they pray that the assignee be required to reclaim them, and account in court for these and the other assets of the company.

The president, directors, and assignee, all deny that the assignment is fraudulent. The assignee says the payment of dividends was illegal, and insists that the right of reclamation passed to him by the assignment, and asks that the stockholders be required to refund. The most of the stockholders deny the illegality of the declaration of dividends,

but if held to be illegal they rely on the following grounds to avoid restitution :

1. They deny that the plaintiffs are in a position to claim the relief which they seek.

2. They set up divers cross-claims against the company, for which they claim set-off.

3. They rely on lapse of time as a protection from the restitution of dividends received more than five years before suit. And,

4. They say that the losses of the directors by indorsements, and advancements, were greater than the amount of dividends made within five years before the bringing of this suit, and hence they are not bound to refund dividends received.

The circuit judge decided the assignment to be valid; that the dividends were illegally declared; that the right to reclaim them did not pass to the assignee; that the lapse of time was no bar to their recovery; and that they should, in the hands of those who had received them, be directly subjected to the plaintiffs' demand; but permitted the stockholders to retain out of what had been received by them, the amount of the claims they held against the company, as well as those they had purchased at a nominal price for the avowed purpose of acquiring a set-off, as those which they had acquired in the ordinary course of business; and referred the case to a commissioner, &c. From this judgment the stockholders, in part, appealed, and the plaintiffs, to have a full adjustment of the case, have also appealed.

The question as to the legality of the *dividends* declared will be first noticed.

The commissioner's report shows the condition of the company when the three last dividends were declared—May, 1848, November, 1848, and May, 1849. It appears that in calculations made semi-annually, by the company, to ascertain the amount of dividend, that the unearned premiums were estimated as assets; that the excess of the assets, so in part composed, above the sum of the capital stock, and

LEX. L. F. & M.
INS. CO. &c.
vs.
PAGE & RICH-
ARDSON.

the liabilities other than those on unexpired risks, was treated as profit; and a large portion of it divided, as such, amongst the stockholders. The aggregate amount of premiums upon unexpired risks at each of the dividends does not appear in the commissioner's report, but the portion of that aggregate which it would have taken to re-insure the outstanding risks does, and even that greatly exceeds the profits at those periods, according to their mode of estimating them.

In May, 1848, when there was a dividend of five dollars per share, or $15,000 in the aggregate, the excess of assets over capital stock and liabilities, other than those arising from risks, was $33,984 91, and at that time it would have taken $83,114 10 to re-insure outstanding risks, excluding those on cargoes.

In November, 1848, when there was a dividend of three dollars per share, or $9,000 in the aggregate, the excess of assets, over capital stock and liabilities, was $14,105 22, and it would then have taken $77,-475 89 to re-insure outstanding risks, excluding those on cargoes.

In May, 1849, there was a dividend of ten dollars per share, or $30,000 in the aggregate; the excess of assets over capital stock and liabilities, other than those arising from risks, was $46,427 15, and at that time it would have required $139,488 89 to re-insure the outstanding risks, not including risks on cargoes.

The commissioner says he is unable to report the cargo risks, and of course what sum would have been required to re-insure them. But by a supplemental report, it appears that from May, 1848, to May, 1851, the premiums received from cargo risks were considerably more than one-third of those received from all other sources. Cargo risks, however, differ from all others, in this, that generally not being heard from between their commencement and termination, lapse of time after commencement does not lessen the cost of re-insurance. So that if the

amount of cargo risks at the time mentioned be any criterion, a very large allowance would have to be made for them to ascertain the true amount which would have been necessary to re-insure all the outstanding risks. Now, as the claims for premiums unearned were greater than the excess of assets above the debts and capital stock when added together, they must have specifically constituted the profits, if any existed, as well as part of the capital itself. And as those claims were not divided amongst the stockholders, but the dividends were generally made of stock notes, they were specifically dividends of the subscribed capital. Possibly this might not have been objectionable, if there had been substituted for the capital so divided, actual profits in a form equally available to the company. But this should certainly be manifested by those seeking to establish the justice of such a division. So far from this appearing, the contrary is shown by the commissioner's report and the correspondence with Ames. The claims which were substituted appear to be uncollectable, and the fact evinced that it was a cause of the early failure of the company. It is clear that no actual profits existed at the time the dividends were declared, but for several years before the failure an actual diminution of the capital.

Any attempt to demonstrate that the claims of an insurance company for premiums on risks still running and undetermined, are not in any sense of the term *profits*, would be but obscuring by argument a self-evident proposition. It would not have been attempted, but for the almost unanimous denial of it by the defendants, including some gentlemen of the legal profession. It was stated as an axiom in the cases of *Scott vs. The Eagle Fire Insurance Company*, 7 *Paige*, 198, and *De Peyster vs. American Insurance Company*, 6 *Ib.* 486.

The word *profits* is defined by Webster as follows: "1. In commerce, the advance in the price of goods sold beyond the costs of purchase. 2. Any gain or

pecuniary advantage. 3. Any advantage; any accession of good from labor or exertion." Obviously the profit of business transactions is the pecuniary gain or advantage derived from them—the excess of all the monies arising from them over all those expended in effecting them. If the expenditure exceed the receipts, there is no *profit;* and the fact that the amount of receipts is ascertained before the expenditures, cannot change the case. The commissioner's report shows enough to make it perfectly clear that the losses exceeded the amount of so many of the premium claims as were proportionate to the time the outstanding risks had to run; or, in other words, which, if collected, would have been sufficient to re-insure the outstanding risks at the rates at which they were taken. The sums which would have been required to re-insure at the two first dates stated, were respectively $83,114 10 and $77,495 89, and the losses sustained by the company before the next subsequent dates, only six months thereafter, were $127,266 74 and $200,150 45. The amount of all the uncollected premiums in May, 1848, was $148,724 54; in November, $131,109 16; in May, 1849, $243,885 76. The report does not show the losses subsequently to the last dividend.

It cannot be said that the losses were such that the company could not have anticipated them, and could therefore not be required to make such large deductions from their assets, before treating the residue as profits; for whatever might have been the result, it could not properly be said that there were profits to divide while the risks were out, which might require the premiums received to meet the losses that might occur.

If the company had desired to be saved from the consequences of their outstanding risks, they could have done so, by re-insuring in other offices. This was not done. If it had been done, the report shows they would not have had any such sum to divide as they did divide; indeed, the capital would have been

reduced. The deficiencies at the respective dates would have been $49,129 29, $63,370 67, and $93,-061 74.

The stock in the hands of a corporation is a trust fund for the payment of the debts of the corporation. (*Story Eq.*, *sec.* 1253.). This principle is sustained by the following authorities: *Angel & Ames on corporations*, 8 ed., 1852, sec. 596, 604; *Woods vs. Dummer*, 8 *Mason*, *C. C. R.*, 308; *Gratz vs. Redd*, 4 *B. Monroe*, 200; *Bridges vs. Lex. & Ohio R. R. Co.*, 7 *Ib.*, 556; *Dudley vs. Price's adm'r.*, 10 *Ib.*, 84; *Vose vs. Grant*, 15 *Mass. Rep.*, 505; *Spears vs. Grant*, 16 *Ib.*, 7; *Mumma vs. Potomac Co.*, 8 *Pet.* 281; *Slee vs. Bloom*, 19 *John.*, 479; *Briggs vs. Puriman*, 8 *Cowen*, 387; *Scott vs. Eagle Fire Co.*, 7 *Paige*, 198; *De Peyster vs. American Ins. Co.*, 6 *Ib.*, 486; *Mann vs. Pence*, 3 *Comstock*, 422; *Ward vs. Greswaldine Man. Co.*, 16 *Conn.*, 593; *Dr. Sammon vs. Hamborough Co.*, 1 *Ca. in Chy.*, 204, cited in 1 *Kidd on Corp.*, 273.) The directors in this case were thereby guilty of a breach of trust in declaring dividends, and the stockholders were equally so by sanctioning their act by receiving them.

The consequence of this course of action was embarrassment to the company, and in September, 1851, the stockholders were required to make a *pro rata* advance of 25 per cent. on their stock, to sustain the company. Many responded to the call, and $41,000 was raised. These advances are preferred in the assignment. It is believed that this preference renders the assignment fraudulent.

It is not denied that corporations may give preferences on assignments. It is also settled that corporations may contract with stockholders, and that in such contracts the stockholder may occupy the attitude of a stranger; and it is conceded, as a corollary, · that the class of preferred debts in the assignment of a corporation includes debts which have become due to stockholders in the ordinary course of business, would not invalidate the assignment. But this case is very different. In this case the preferred debts are

debts due exclusively to stockholders, and not incur-
red in the ordinary course of the corporate business.
They are debts for advances by the stockholders,
*as such*, intended to be *pro rata* with the amount
of their stock, and to become in all respects as capi-
tal.

The substance of the transaction is, that the cor-
poration divided out, among themselves, the capital
stock, in part; then loaned it back to the company;
an assignment is made, and the supposed debt for the
loan is made a preferred debt. Can the capital
stock of the corporation be thus diminished to a mere
fraction of the investment? It is supposed it can-
not. The tendency of judicial decision is, to hold-
ing corporators to a strict responsibility for the capi-
tal invested. (See *Angel & Ames on Corporations,*
546.) In this case the stockholders will have secured
to themselves the whole capital, whilst the creditors
are unpaid. If this cannot be done, the assignment
must be set aside, and the assets made subject to
plaintiffs' claim.

The corporators deny a knowledge of the insol-
vency of the company, in 1851, when the advances
were made. If they did not know, they had all the
facts necessary to enable them to know, and they
should have known, and should be treated as know-
ing it.

Soon after the advance, the company, by letter,
assured the plaintiffs of the solvency of the compa-
ny. This was calculated to deceive the plaintiffs,
and induce them to make advances. Now, if a par-
ty misrepresent the credit of another, he will be re-
sponsible. (See 2 *Kent, Com.,* 488, *and cases cited;*
1 *East.* 318, *and cases there cited; Thomas vs. McCann,*
4 *B. Monroe,* 603.)

The authorities already cited abundantly sustain
the principle asserted in *Story's Com., section* 1252,
" that if the capital stock should be divided, leaving
any debt unpaid, every stockholder receiving his
share of the capital stock would, in equity, be held

liable to contribute to the discharge of such debt out of the funds in his hands.

The next question is, did the right to reclaim the dividends improperly made and paid to the stockholders, pass to the assignee by the assignment? This depends upon the right of the grantors to reclaim, and the sufficiency of the deed, by its terms, to pass that if it existed. To determine the first question, it is necessary to ascertain the ground upon which the right exists, and is to be enforced. All the cases place the right to reclaim, upon the ground that the declaration of the dividend by the directors, and the receipt thereof by the stockholders, was a breach of trust; and that the court will follow the trust fund. No trustee can be relieved against the consequences of his own breach of trust; no man shall be permitted to take advantage of his own wrong. If this be the only ground on which the relief can be granted, the corporation could have no right to sue for the dividends, and of course could not assign such a right.

But in the case of *Gratz vs. Redd, supra*, this court intimated that when illegal dividends were made in good faith, they might be reclaimed by the directors on the ground of mistake of law. This intimation was, however, withdrawn by an *addenda* to the opinion.

This question whether courts will relieve in cases of mistake of law singly, without being connected with other grounds, is one which has been much discussed, and the adjudications are far from being uniform. The courts of Kentucky say, however, that they will relieve against clear and palpable mistakes of law, as well as of facts. In the cases, however, in which this principle is announced, there is a considerable admixture of other grounds of equitable jurisdiction. The leading case is that of *Underwood vs. Brockman*, 4 *Dana*, 309. The circumstances of alarm, weakmindedness, and threats of suit, &c., appeared as a ground for selling under the contract,

and the court say " there must have been surprise, incompetency, fraud, or *ignorance* of the law." The case of *Ray & Thornton vs. the Bank of Kentucky*, 3 *B. Monroe*, 514, is also a case where there was a concealment of a fact important to have been disclosed by the bank. The court said, "but when it can be made perfectly evident that the only consideration of a contract was a mistake as to the legal rights and obligations of the parties, and when there has been no fair compromise of *bona fide* and doubtful claims, we do not doubt that the agreement might be avoided, on the ground of a clear mistake of law," &c. And again, on the next page it said : " Lord Ellenborough has taken the ground that a compromise may be set aside, and for an *obvious* mistake of *plain* law, when of course there was no other motive for it." To justify the relief it must be perfectly evident that there was no other motive than a clear mistake of plain law.

But what is this case ? Certainly the payment of the dividends was not superinduced by either misrepresentation, imposition, undue confidence, undue influence, or mental imbecility, or that sort of surprise which equity recognizes as a ground of relief. They were voluntarily made, by men of the highest intelligence, after the question had been made as to the right to declare them. Can it be said, under this state of fact, to be *perfectly evident* that there was no motive of personal interest, and that it was a clear mistake of *plain law ?* The parties still deny that there was any mistake, and resist the relief; besides, if there was any mistake it was a mistake purely of law, of which the company should have been informed. The rule cannot be extended to embrace this case.

It is also contended that if there be a right of reclamation, it did not pass by the assignment. The defendants say it was not supposed that there existed any right of reclamation, and therefore it was not in the contemplation of the parties to assign it.

LEX. L. F. & M.
INS. CO. &C.
vs.
PAGE & RICH
ARDSON.

This is admitted by the assignee, and proved by the subsequent conduct of the board; no steps were taken or order made indicating such a thing. The right did not pass, unless it was the intention of the parties that it should pass; and though the language is very broad, but it submitted to the court whether such an inchoate right could or did pass, without some order or act of the board, indicating an intention to take advantage of it. If it did pass it was a mistake of the parties, and should be relieved against on that ground. The surrounding circumstances show there was no intention to pass this right, and a writing "may be read in the light of surrounding circumstances." (*Greenleaf Ev., secs.* 277, 288.)

But the right to reclaim the dividends is denied; and one ground of defense is, that there is no judgment and return of *nulla bona*. This objection cannot avail; the principle has no application to cases within the equity jurisdiction of the court upon other grounds. If the company has no right to reclaim the dividends, the grounds of relief are altogether distinct from that provided for by statute. The plaintiffs are not seeking to subject a *chose in action* of their debtor, but a fund on which their debtor has no claim; not in consequence of any statutory regulation, but upon the original ground of equity jurisdiction, that the fund is a special trust fund, withheld from them against equity and good conscience. Courts of law have no power to follow trust funds into the hands of third persons, and where the trust funds of a corporation are found in the hands of third persons, courts of law can afford no adequate remedy to reach them.

Courts of equity have general jurisdiction to subject trust funds to the payment of trust debts, not by statute, but upon general principles of equity. The capital stock of corporations is specially dedicated to the payment of the corporation debts, and courts of equity will subject the stock to that purpose, whether it be in the hands of stockholders or others

having knowledge of the trust. The court is refer-
red to the case of *Wood vs. Dummer*, 3 *Mason, C. C.
R.*, 308, in which nearly every question arising in
this case is discussed and decided. In that case
there was no judgment; such was the fact in *Hall
vs. U. S. Ins. Co.*, 5 *Gill*, 484. In the case of *Ward
vs. Gus. Man. Co.*, though there was a return of *nul-
la bona*, the relief was placed on the ground of insol-
vency and no visible property. (See also, *De Salmon
vs. the Hamborough Co., Cases in Chy*, 204; *Slee vs.
Bloom*, 19 *Johnson*, 479; *Briggs vs. Penniman*, 8 *Cowen*,
387; *Dudley vs. Price*, 10 *B. Monroe*, 84.

It is confidently believed that no case can be found
where a court of equity has refused to subject the
funds of a corporation to the claims of creditors,
where there has been a breach of trust, and the funds
are in the hands of other persons having notice of
the trust, and the corporation insolvent. Where
property has been dedicated to the payment of debts
no judgment is necessary.

In this case it is alledged that the corporation has
assigned and disposed of all its property and means,
and that the company is insolvent. These allega-
tions are not denied; and by such acts, according to
the decision of this court in the case of *Dudley vs.
Price, supra*, "had destroyed the end for which it was
incorporated, and was, by operation of law, dissolv-
ed," and that it would, on that ground, grant the re-
lief prayed for—which is the same asked in this case
—if it was not barred by lapse of time. The argu-
ment of the chancellor, in the case of *Penniman vs.
Briggs*, 1 *Hopkins Ch. Rep.*, is particularly applicable
to this case.

1. Though there may have been no fraud intend-
ed in making dividends, when there was no profits
to divide, yet if they were made without proper con-
sideration, and in violation of law, without leaving
a fund sufficient to meet outstanding liabilities, it
was clearly fraudulent in law, though the result of

Lex. L. F. & M.
Ins. Co. &c.
    vs.
Page & Rich-
ARDSON.

gross negligence and incapacity of their agents, ra-
ther than a fraudulent intent.

But if the right to reclaim dividends improperly
paid and received, passed to the assignee, there can
be no doubt of the right of the plaintiffs to compel
the trustee to collect the same, and account for the
whole trust funds, as they are provided for in the as-
signment, unless they are deprived of the benefit
under the deed, because they charge it to be fraudu-
lent. This does not seem to be much relied upon,
however, and is not available. (*Story's Eq., secs.* 1098–
'99; *Replier vs. Buck,* 5 *B. Monroe,* 98.)

2. Several of the defendants plead and rely upon
set-off. So far as they were obtained in the ordinary
course of business no reason is perceived why they
should not be allowed; but a large portion of them
were purchased at a merely nominal price, after the
company had failed, and for the purpose—as ac-
knowledged by them in their answers—of protecting
themselves against a reclamation of the dividends
received; and as to such claims no set-off should be
allowed, beyond the actual sum paid. A purchase
by a trustee, of a claim upon a trust fund, enures to
the benefit of the *cestui que trust.* (*Story's Equity,*
section 1211, *and cases there cited;* 5 *Dana,* 445; 2 *Mar-
shall,* 389.

But if the right to reclaim the dividends passed to
the assignee, then no claim purchased after the as-
signment can avail, unless the purchaser could rely
upon lack of notice of the assignment; which would
be in substance a plea of ignorance of their own
act, done, it is admitted, by agents, but agents of
their own choosing, and acting within the scope of
their authority, *qui facit per alium facit per se.*

They are presumed to have had knowledge of the
assignment; if not actual knowledge, enough is
shown to put them on inquiry, which is tantamount
to actual notice in its effects and consequences.
(*Johnson vs. Bloodgood,* 1 *Johnson's Ca.,* 61; *Anderson
vs. Van Allen,* 12 *John. Rep.,* 343; *U. S. vs. Sturgus,*

*Payne,* 525; *Same vs. Clark, Ib.,* 629; *Kellogg vs. Krauser, Searg. & R.,* 137; *Cotton vs. Hart,* 1 *Ma:shall,* 98; *Kent's Com.,* 6 *Ed.,* 179; *Com. Dig., Title, Chy.* 4, *C.* 2; 4 *Litt.,* 320.

3. Lapse of time is relied upon with much apparent confidence. The last items of the plaintiff's account, constituting the balance, are dated less than five years before the suit was brought; of course no right of action existed upon them until they existed. The lapse of time can only be applied from the time a right of action accrued. The statute of limitations does not apply in terms to the remedies afforded by the chancellor. Courts of equity apply the bar only in analogy to the legal bar. The statutes cut off the legal remedy, if not pursued within a specified time after the right of action accrues, and courts of equity deny the equitable remedy, unless pursued in the same length of time. If an equitable remedy accrues in a case in which there had previously been a legal remedy, execlusively at law, the statute runs from the accrual of the legal remedy, but the bar by time, in equity, only begins to run from the subsequent accrual of the equitable remedy. (*Story's Eq., sec.* 1521, *a.*) Such is the case when a fraud or mistake is discovered, in which there was a previous legal remedy. (*Pyle vs. Beck-with,* 1 *J. J. Marshall,* 445; 4 *Ib.,* 77.) Such is the rule recognized in *Wood vs. Dummer,* where the equitable remedy to subject the capital in the hands of the stockholders, accrued subsequently to the legal remedy, to subject that in the hands of the company, and it was held that the bar should not be applied but from the time the equitable remedy accrued. This case is recognized in the case of *Dudley vs. Price's adm., supra.*

Again, the cancellation of the stock notes of the shareholders was illegal. There was, in fact, no payment; they were supposed to be paid by dividends, illegally declared, and therefore not paid at all, and the creditors should now have the same ben-

efit from those stock notes as if they had not been cancelled. (See *East India Co. vs. Donald*, 9 *Vez.*, 275; *same vs. Neave*, 5 *Ib.*, 173.) The stockholders should be held responsible, as though the stock notes were in full force—not cancelled. *Sluysken vs. Hunter*, 1 *Merivale*, is very similar to this; *Nathan vs. Whitlock*, 9 *Paige; Hall vs. U. S. Ins. Co.*, 5 *Gill*, sustains this view also.

4. The defendants, who are directors, claim to be protected in consequence of losses sustained by indorsements. No reliance was placed upon this ground of claim in the circuit court. It is supposed these claims could not be allowed, further than as a set-off in behalf of those relying on them, to the extent of dividends received by them individually, if at all; and as to any balance in their favor, it would be a claim against the company as general creditors. It cannot be supposed that there is any special lien on dividends in the hands of others; but no such claim has been set up.

January 23.

Judge SIMPSON delivered the opinion of the court:

[This opinion was delivered 23d January, 1856, but suspended by a petition for a re-hearing, which was overruled.—REP.]

On the first of November, 1851, the Lexington Fire, Life and Marine Insurance Company made an assignment of the whole of its effects to R. A. Buckner, in trust, to pay off the debts of the company according to the order therein specified.

In the spring of 1849, and previous to that time, the company had declared several semi-annual dividends of what was deemed by the board of directors to be its profits, some of which dividends were credited upon the notes which had been executed by the stockholders for the payment of their stock subscriptions.

This action was brought by Page & Richardson, who claim to be the creditors of the company for advances made by them in the payment of losses,

and for their commissions in acting as the agents of the company.

The plaintiffs, in their petition, presented their claim to relief in a double aspect. They attempted to impeach the validity of the assignment to Buckner on the ground of fraud; but, if the deed be valid, they prayed that they might have the benefit of its provisions so far as they would operate in their favor. They also charged that the dividends which had been declared by the company were illegal, having been made when in fact there were no profits to divide; and prayed that the stockholders might be compelled to refund enough thereof to pay their demand, unless the right to reclaim them had passed to the trustee, in which event they prayed that he might be required to collect them and account for them as part of the assets of the trust. The insurance company, Buckner the assignee, and the individual directors and stockholders who declared and received the dividends, were all made defendants to the petition.

By an amended petition, the plaintiffs alledged that they had not discovered the illegality of the dividends until within five years next preceding the commencement of the action.

The defendants filed separate demurrers. The President, directors and trustee, also answered and denied that the deed of trust was fraudulent. The trustee insisted that the right to reclaim these dividends passed to him by force of the assignment. The stockholders denied the illegality of the dividends, and set up the following grounds of defense in the event that they should be adjudged to have been illegally declared.

They relied upon the statute of limitations: presented various demands against the company, for which they claimed credit by way of set-off, and denied that the plaintiffs were in a position to entitle them to a judgment against them, inasmuch as a

Lex. L. F. & M.
Ins. Co. &c.
. vs.
Page & Rich-
ardson.

court of equity had no jurisdiction, upon the allega-
tions contained in the petition.

The circuit court overruled the demurrers; ad-
judged that the assignment was valid; that the div-
idends were illegal; that the right to reclaim them
did not pass to the trustee; that the statute of limi-
tations was no bar to their recovery; and that the
court had jurisdiction to subject them directly to the
payment of the plaintiffs' demand; but that the
stockholders had a right to retain out of the divi-
dends any demands they had acquired against the
company before this action was instituted.

From this judgment the defendants have appeal-
ed, and the plaintiffs have prayed a cross-appeal.

The validity of the assignment to Buckner is the
first question that we will consider.

The extrinsic evidence of fraud is so very slight,
and is so far from sustaining the charge, that we do
not deem it necessary to make any further reference
to it. Indeed, the principal objection made to the
assignment is, that it furnishes on its face, as is con-
tended, intrinsic evidence of a fraudulent intent.

Previous to the execution of the deed of trust to
Buckner, many of the stockholders had advanced to
the company, either in money or negotiable paper,
twenty-five per cent. on the amount of their stock, to
enable it to continue its business. The advance-
ments thus made were treated as debts by the com-
pany; their payment was secured in the deed of
trust, and precedence given to them over numerous
other demands held by other creditors. It is con-
tended that these advancements were made by the
stockholders *as such*, and should not have been con-
sidered as debts due by the company, but as part of
the capital advanced by the stockholders, on which
the company was to operate for their benefit. And
further, that the stockholders were in reality trus-
tees, and having, in the management of the trust,
previously converted to their own use a larger
amount of the trust funds than the sums advanced

by them, that under these circumstances the deed of trust made to secure the repayment of these advancements was fraudulent and illegal.

This argument is fallacious in several of its assumptions. The capital of the company consisted in the amount paid for stock by the shareholders, and any money which they advanced to it beyond that which was due on their stock, became in reality a debt. Although called an advancement, it was substantially a loan, and was so regarded by the parties. And as it was made to enable the company to pay off debts which it had incurred, so that it might sustain its credit and carry on its business, it constituted a debt as meritorious in every respect as any other demand against the company. The stockholders, instead of being trustees, were substantially the *cestui que trusts*. They furnished the capital which was to be used and managed by the board of directors for their benefit and advantage. They were not trustees in any sense of the term. Individually they had as much right to deal with the company as third persons. They could contract with and sue the company, and in all other respects deal with it as if they were strangers. The board of directors did not derive its authority from them, nor act, properly speaking, as their agent. Its powers were derived from the charter of the corporation, and were wholly independent of the action of the stockholders. The stockholders were members of the corporation, but its business was conducted by instrumentalities created by the charter, and its powers were derived from the same instrument, and not from the corporators.

If the corporation had an available claim against the stockholders for illegal dividends which they had received, still, as that claim was not asserted, nor its existence even recognized at the time of the assignment, it was not fraudulent to secure to them the payment of the money which they had advanced, and which was an existing and acknowledged liabil-

1. A stockholder in a corporation may deal with the company as an individual, and become a creditor as any other individual, and may be secured as a preferred creditor in an assignment by the corporation, without, on that account, incurring the imputation of fraud.

ity. No inference of a fraudulent intent can be de-
duced therefrom, nor does it subject the assignment
to any suspicion of unfairness, any more than such a
preference would have done had no such claim
against the stockholders existed on the part of the
corporation. The demands were wholly independ-
ent of each other, and therefore there was no such
connection between them as rendered it necessary
in securing the one, to refer to the other, even had its
existence been known at the time. Consequently,
the conveyance to the trustee must be deemed legal
and valid.

The next question that properly presents itself for
consideration, is that which involves the legality or
illegality of the dividends which were made by the
board of directors.

By the seventh section of the charter by which the
company was incorporated, it was enacted "that it
shall be the duty of the president and directors, on
the first Mondays of May and November in each
and every year, to make a dividend of so much of
of the profits of said corporation as to them, or a
majority of them, shall appear advisable."

The board of directors, in making the dividends
in question, considered as profits the premiums on
unexpired risks, and unless this was proper, the div-
idends which were made were not authorized by the
charter, inasmuch as independent of these premiums
the means of the corporation, over and above its lia-
bilities, were insufficient for their payment. We
think it is very evident that these premiums could
not be properly regarded as profits. Only so much
thereof as might remain after paying the amount of
such losses as should occur, would in reality consti-
tute the actual profits on the insurances upon which
they had been paid. This was the decision of the
court in the cases of *De Peyster vs. American Insurance
Company*, 6 *Paige* 486, and in *Scott vs. Eagle Fire In-
surance Company*, 7 *Paige*, 198, which were cases ve-
ry similar to the present one. We cannot, indeed,

2. A corpora-
tion is not justi-
fiable in treat-
ing as profits,
subject to be di-
vided, premiums
received upon
unexpired risks,
when it had not
a fund sufficient,
independent
thereof, to meet
all liabilities
that might ac-
crue on the pend-
ing risks. (6
*Paige*, 486; 7
*Ib.* 198.) And
dividends thus
made may be re-
claimed by the
corporation.

very well perceive any plausible ground on which this position can be controverted. The losses must, in every case, be deducted before the profits, in any kind of business whatever, can be ascertained. This propositton is so self-evident, that argument to sustain or illustrate it is wholly unnecessary.

So much of these premiums might possibly have been regarded as profits, as the previous business of the company, for a series of years, would have demonstrated could be safely considered as a surplus that would remain after all losses were paid; but upon no imaginable hypothesis could it be right or admissible to treat the whole amount of premiums, which resulted from risks that were still pending, as actual profits. The most safe, and, indeed, only allowable principle to act upon in such cases, would be to exclude from the computation of profits altogether, all such unearned premiums. Excluding such premiums, some of the dividends were made when there were no profits on hand to divide among the stockholders, and such dividends were obviously unauthorized and illegal. It is, however, difficult to determine, either from the commissioner's report, or any evidence in the cause, which of the dividends should be regarded as subject to reclamation. It is necessary to a correct decision of this question, that the condition of the company at the time each one of the dividends was made should appear. Two dividends might be made without there being on hand a sufficiency of profits to have authorized either at the time they were respectively declared, and still the last one might have been proper, if the first one had not been made. In such a case it would be manifestly wrong to treat both of the dividends as illegal in the hands of the stockholders. The last one might have been retained by the corporation to satisfy its claim against the stockholders for the first one, which was illegal; but when it has been paid over, a different question is presented. The question then is, which one of the two is subject to

reclamation? The first one the stockholders have no right to retain because it was unauthorized, and therefore it is undoubtedly subject to reclamation. If, then, the corporation has a right to reclaim the last one also, it might be able to compel both of them to be refunded.

It is evident, therefore, that it is indispensably necessary, in order that the court may be able to determine how many and which of the dividends were illegal, that is, how many of them were subject to reclamation, if any, that all the dividends that have been made, and the condition of the corporation when they were made, should appear.

The next subject of inquiry is, supposing some of these dividends to be illegal, did the right to reclaim them pass to the trustee by the deed of trust which was executed by the corporation?

3. Dividends declared by the directors, and received by the stockholders, may be reclaimed by the directors, if illegally declared under a misapprehension of the right to declare them; and if there be an assignment by the corporation to a trustee, such right to reclaim dividends improperly declared and paid passes to the assignee, if the terms of the assignment are sufficiently comprehensive to embrace them.

The solution of this question involves two matters of inquiry: First. Had the corporation a right to reclaim these dividends? And, in the second place, if the right existed, did it pass by the deed, under the peculiar circumstances in this case?

The declaration of these dividends was undoubtedly made in good faith, although it was made under a misconception of what constituted the profits of the company, out of which the board of directors were authorized to make dividends. This court, in the case of *Gratz vs. Redd*, 4 *B. Monroe*, 191, intimated an opinion, although the question was left undecided, that the company could reclaim dividends which had been made under similar *circumstances*. It would seem, according to well settled general principles, that if dividends were made under a misconception on the part of the directors of what constituted profits, and under a belief that there were profits to divide, when in fact there were none, they might be reclaimed; because the stockholders who received them were not entitled to them, and they had been paid over and received under the operation of a mutual mistake.

We are unable to perceive any reason why this equitable principle should not apply in the case of a mistake by a corporation, as well as when made by individuals. The stockholders do not act in a corporate capacity in receiving a dividend. They do not, therefore, ratify the illegal act of the board of directors by receiving it. Besides, as they were not apprised that the dividends were illegal, their censent to the act of the directors in declaring them, could not be implied from their receiving of them, even if in so doing they acted in a corporate capacity. We are, therefore, of the opinion that the corporation had a right to reclaim such dividends as were illegally declared, and which the stockholders had no right to retain.

Did, however, the right which the corporation had to the dividends which had been wrongfully declared, pass to the trustee by the deed of assignment? The language of the deed is comprehensive enough to pass this right, as well as all others. By the granting clause therein, the company transferred and conveyed to Buckner, as trustee, "all of its property of every description, whether real, personal, or mixed; judgments, notes, bills, open accounts or other claims, or choses in action, wherever the same may be situated, and in whosesoever hands the same may be found." It is argued, however, that as the president and directors of the company had not, at any time previously to the execution of the deed, asserted the right of reclamation, and did not even then admit that these dividends had been made unlawfully, it could not have been in the contemplation of the parties, that the right to reclaim them should pass by the deed; and that it did not pass, unless it was the intention of the parties to the assignment that it should do so.

The words used by the parties are sufficient to pass the right, and we cannot perceive on what principle it can be excluded from the operation of the deed. It is not pretended that there was any mistake in its execution. There is no ambiguity in the

LEX. L. F. & M.
INS. CO. &c.
vs.
PAGE & RICH-
ARDSON.

terms used, nor any ground upon which parol testimony can be admitted to explain the intention of the parties, or to change the legal effect and operation of the deed. How then can any restriction be placed upon the legal effect of the written instrument? Not certainly from any thing contained in it, for its language is plain, comprehensive, and unambiguous; not from any thing extrinsic, because a resort to such facts is, according to the well settled principles of the law, wholly inadmissible.

It is argued, however, that the extrinsic facts necessary to produce a change in the legal effect of the deed, are admitted by the parties, and therefore their admission in giving construction to the writing does not violate any settled principle of the law. This assumption is not warranted by any thing contained in the record. The trustee did not admit that the right to these dividends did not pass to him, under the deed, nor that the company did not know, at the time of its execution, that such a right existed, although he stated that he was himself ignorant of the fact. Nor did the plaintiffs themselves state in their petition that the company did not know, when the deed was executed, of the existence of this right of reclamation, or that it did not pass by the deed of trust; but on the contrary, charged expressly that it did pass to the trustee by the terms of the deed, if the deed itself was valid, and not fraudulent and void. So that in reality there was no issue between the parties, which required an acknowledgment or a denial of the extrinsic facts relied upon to limit the legal effect of the deed.

But if it did appear in a legal and competent mode, that the authors of the deed, and the trustee likewise, were of the opinion at the time of its execution, that these dividends had been all legally declared, and no right of reclamation existed, it would not necessarily follow that the right, if it did exist, did not pass by the deed. It is apparent, from the language used, that it was the *intention* of the parties

to the instrument, that all the claims and *choses of action* of every description, which belonged to the company, should be transferred to the trustee.   This intention is manifest on the face of the deed itself. Can it be defeated by showing that the authors of the deed were ignorant of the existence of some of the rights or claims of the company ?   The deed does not transfer merely the known and acknowledged claims and *choses in action*, but also those of every description, and embraces both the known and the unknown.   So far, then, as the construction of the deed depends upon the question of *intention*, it is evident that it should be permitted to have its legal effect; for we think considering the language used therein, the proposition may be assumed as undeniable, that if the existence of the right had been known to the makers of the deed; it would not have been excluded from its operation.   As then, the terms used clearly embrace the right, and the intention to exclude it cannot be deduced, even from the facts relied upon to change and restrict the operation of the deed, it must be regarded as having passed to and vested in the trustee for the benefit of the *cestui que trusts*.

This view is sustained to some extent by the decision in the case of *Bayard vs. Hoffman*, 4 *John. Ch. R.*, 450.   In that case a debtor made a voluntary settlement of United States stocks upon his wife and children, by conveying them to trustees for their benefit; and he subsequently made an assignment " of all his estate, real and personal, and of all books, vouchers, and securities relative thereto."   Chancellor Kent decided, that the general assignment for the benefit of creditors carried with it the stock thus voluntarily assigned, and the trustees under the voluntary settlement were decreed to hold the stock subject to the order of the trustees under the general assignment.   Effect was there given to the same principle that has been applied in the present case. The words used were sufficiently comprehensive to

Lex. L. F. & M.<br>
Ins. Co. &c.<br>
*vs.*<br>
Page & Rich-<br>
ardson.

LEX. L. F. & M.
INS. CO. &c.
vs.
PAGE & RICH
ARDSON.

4. Express continuing trusts, which are exclusively cognizable in chancery, are not embraced by the statute of limitations; but where there is a legal responsibility, and a trust by implication, the statute may be relied on with effect. (*Dudley vs. Price's adm.*, 10 *B. Mon.* 84; 3 *J. C. R.* 216; 5 *Ib.* 531; 12 *Vez.* 87; *Story's Eq.*, sec. 1252; 7 *J. C. R.* 89; 5 *Dana*, 199; 16 *Searg. & Rawle*, 379.)

embrace and transfer the stock, and it was therefore held to have passed by the general assignment.

Can the stockholders rely upon the statute of limitations to protect themselves against the recovery of these dividends? The only argument that has been urged against their right to avail themselves of the statute is, that the dividends were a part of a trust fund, and should be regarded as having been received by them as such, and held by them as trustees.

The doctrine is well settled that such express and continuing trusts as are within the exclusive jurisdiction of courts of equity, and are not cognizable at law, are not affected by the statute of limitations.

But here there was no express trust; if any existed, it resulted by implication, from the facts of the case. The money was received by the stockholders in their own right, as that to which they were legally entitled, and there is nothing which authorizes the inference, that they ever agreed to hold it in trust, or claimed it otherwise than as belonging to themselves.

Besides, the corporation could have maintained an action at law, for the recovery of the money received by them; and a court of equity would have had no jurisdiction to have adjudged its repayment to the corporation.

If, then, it constituted a trust at all in the hands of the stockholders, it was not an express *trust*, but received its character from legal implication, and was not such a trust as is within the exclusive jurisdiction of courts of equity, but was cognizable in a court of law, and consequently lacked the essential attributes of those trusts that are exempted from the operation of the statute.

It was held by this court, in the case of *Dudley vs. Price's administrators*, 10 *B. Monroe*, 84, that the stockholders, in a similar case, were clearly entitled to the protection of the statute, and we still approve

of the principle laid down in that decision. Indeed
we cannot perceive how any other result is attaina-
ble, without a clear departure from the well settled
and universally recognized doctrines of the law upon
the subject.

"Possible, eventual, or resulting trusts occur where
a party, who took possession in his own right and
was *prima facie* the owner, is afterwards converted
into a trustee by evidence. In these latter cases it
was never doubted that length of possession would
be a bar, on the principle of the statute of limita-
tions." (*Decouche vs. Savatier*, 3 *Johh. C. R.*, 216; *Cos-
ter vs. Murray*, 5 *John. C. R.*, 531; *Beckford vs. Wade*,
12 *Vez.*, 87.)

If these illegal dividends were a trust fund in the
hands of the stockholders, they were made so by ev-
idence which made it appear that they were declar-
ed at a time when there were no profits on hand to
divide. The trust, if thus established, was clearly
an implied trust, created by testimony, and arising
out of the facts of the case.

In 2*d Story's Eq. Jur.*, sec. 1252, it is said: "Per-
haps to this same head of implied trusts upon pre-
sumed intention, (although it might equally well be
deemed to fall under the head of implied trusts by
operation of law,) we may refer that class of cases
where the stock and other property of private corpo-
rations is deemed a trust fund for the payment of the
debts of the corporation; so that the creditors have
a lien or right of priority of payment on it, in prefer-
ence to any of the stockholders of the corporation.
Thus for example: 'the capital stock of an incorpo-
rated bank is deemed a trust fund for all the debts of
a corporation; and no stockholder can entitle him-
self to any dividend or share of such capital stock,
until all the debts are paid; and if the capital stock
should be divided, leaving any debts unpaid, every
stockholder receiving his share of the capital stock,
would in equity be held liable, *pro rata*, to contribute

Lex. L. F. & M.
Ins. Co. &c.
vs.
Page & Rich-
ardson.

to the discharge of such debts, out of the funds in his own hands.' "

If the corporation itself holds its property and effects only on an implied trust for the payment of its debts, most certainly the stockholders, if they receive part thereof by way of dividends, cannot be regarded as holding it, if in trust at all, under an express trust, for the payment of debts, when it was not thus held by the corporation. Can the right of the latter, to rely upon the statute of limitations when sued by a creditor, be doubted? If such a right exist, it proves conclusively that a corporation does not hold its assets under an express trust, for the payment of debts; for if it did, the statute could not be used by it as a defense against any demand that a creditor might attempt to assert.

Thus it is fully established, both upon principle and authority, that the dividends in the hands of the stockholders, if a trust fund at all, were held by them under an implied, and not an express trust. And the doctrine is well settled, that the trusts which are not to be affected by the statute of limitations in a court of equity, are only those direct, express, and continuing trusts which fall within the peculiar and exclusive jurisdiction of courts of chancery, and not those created by implication merely. (*Kane vs. Bloodgood*, 7 *J. C. R.*, page 89; *Talbot vs Todd*, 5 *Dana*, 199; *Angel on Lim.* 354; 16 *Serg. & R.*, 379.)

The decision in the case of *Wood, &c., vs. Dummer, &c.*, 3 *Mason*, 308, instead of militating against, rather tends to fortify the conclusion, that the stockholders held the fund under an implied or constructive, and not an express trust. In that case, a dividend of the capital stock of a bank had been made among the stockholders, in pursuance of an order made at a meeting held by themselves. The corporation was dissolved, by the expiration of the time for which it had been chartered, and of the legislative limitation by which its existence had been subsequently continued for a limited time. A suit in

equity was brought by the holders of the notes of the bank, against the stockholders, for the payment of them, out of the capital stock in their hands. The court decided, not that the statute of limitations would not apply to such a case, but only that the bar could not, on the facts of the case, be sustained. The court said, "the rights of the plaintiffs accrued, as against the defendants, within six years; for until a refusal of payment by the bank of its notes, followed by an inability to discharge them, there was no cause of proceeding in equity against the defendants."

How long the funds had been in the hands of the stockholders before the suit was commenced, does not appear; but all that the court did actually decide in relation to the operation of the statute was, that upon the facts, the time necessary to constitute a bar had not elapsed, and therefore the bar to a decree could not be sustained. The court, however, in the same case, held, that the simple fact that the defendants had the funds in their possession, could not alone entitle the plaintiffs to relief, without allegations of insolvency on the part of the corporation, or of the non-existence of other funds. Such an admission was a virtual concession that no express trust existed; for if the stockholders, by the reception of the fund, were thereby made the trustees of the creditors, and held it under a direct and express trust for the payment of the debts of the corporation, a suit in equity for the enforcement of the trust was the appropriate remedy; and no allegation of the insolvency, or dissolution of the corporation, or of the non-existence of other funds for the payment of its debts, was necessary to entitle the plaintiffs to relief.

But it is contended that if the statute does apply in a case like the present, that still the time of limitation had not run when this action was commenced by the creditors, and consequently the bar was not then complete. The right of action for the re-

covery of these funds was in the corporation; it existed as soon as they were paid over to the stockholders, and the time of limitation commenced running from that period. When the bar became complete against the corporation, it was also complete against its creditors. If the debtor cannot recover a demand because it is barred by the statute of limitations, most certainly the creditor of the debtor cannot compel its payment in discharge of his debt, on the ground that his cause of action had accrued within five years. His cause of action exists against his debtor, and he can only follow the funds of the latter into the hands of third persons, when it is his only remedy for the recovery of his debt; and his rights then, in the pursuit of such funds, do not exceed those that belong to his debtor.

But it is unnecessary to pursue this investigation any further, inasmuch as the right to the funds in the hands of the stockholders passed to the trustee, under the assignment, and the right thus acquired by him is subject to be affected by the statute, to the same extent it would be if it still belonged to the corporation; and there can be no pretext for considing it as a trust fund in the hands of the stockholders, for the benefit of the company.

In the case of *Wood, &c. vs. Dummer, &c., supra*, the corporation was dissolved, and the stockholders had distributed the capital stock among themselves. No right of action against them existed in favor of any person, except the creditors of the corporation. Hence the court decided that as the plaintiffs' action accrued within six years, (the time of the limitation in that state,) the bar was not complete and could not be sustained. Between that case and this there is a marked and obvious distinction. Here the dividends were made, not by the stockholders, but by the board of directors. No part of the capital stock was distributed, but only a fund, which was erroneously supposed to constitute actual profits; and which the corporation had a right to sue for and re-

claim immediately after the dividends were paid over. In addition to this, the stockholders in the one case received the capital stock, knowing that it was the *proper fund* for the payment of the debts of the corporation, and might be presumed to have held it subject to that charge; whereas, in the other, they received the dividends as a fund to which they believed themselves entitled; which they held and claimed as belonging to themselves exclusively, and the right to which, in any other person, was virtually denied by them.

The ignorance of the directors, with regard to the right of the corporation to retain the dividends, cannot be relied upon to prevent the running of the statute. The facts were all known to them, and by the exercise of reasonable diligence they could have ascertained—and it was their duty to do it—whether or not the dividends were authorized by the charter. Willful ignorance, or that which results from negligence and the want of that degree of vigilance which the law requires, cannot be deemed sufficient to prevent the operation of the statute.

Nor can the manner in which part of the dividends were used by the stockholders, have any effect on the rights of the parties, under the statute. The stock notes, upon which they were credited, having been voluntarily cancelled and delivered up, the right to sue upon them does not exist; and the only action that can be maintained is, one either for the recovery of the illegal dividends, or for relief in a court of equity, on the ground of mistake, upon the principle on which settled accounts are opened, and mistakes are corrected. In such cases, unless an action be commenced within five years after the discovery of the mistake, the remedy will be barred. It cannot be admitted that if a note be surrendered, upon a settlement between the parties, the payee can, on the ground of a mistake in the credits allowed, institute an action at any time within twenty years, regarding the note as the foundation of the

action, and thereby entitle himself to all the rights he would have if the note were in existence. Such a principle might subject the payor of the note to great injury, from the loss of testimony by the lapse of time, and is not sanctioned by any of the adjudged cases to which we have been referred. The cases of the *East India Company vs. Neave*, 5 *Vez. C. R.*, 173, and of the *Same vs. Donald*, 9 *Vez. C. R., p.* 275, only decide that where a written instrument has been delivered up, in ignorance of a matter which would have authorized its retention, and the assertion of a demand upon it, the party will be entitled to relief against the *obligor in a court* of chancery, on the ground that he has no legal remedy, in consequence of having parted with the written instrument, in ignorance of his rights. They do not decide any thing upon the subject of the time within which such relief will be granted; and as the principle laid down in *Story's Eq., sec.* 167, that if an instrument be cancelled through a mistake, the obligee "ought to have the same benefit as if the instrument were in his possession, with its entire original validity," is based upon the two cases just mentioned. The author should be understood as merely asserting the same doctrine upon which those cases were decided, and as referring, not to the time in which relief against the mistake might be obtained, but to the extent of the relief to which the party would be entitled under such circumstances. He would have a right to a decree for the same amount that he could have recovered at law, "if the instrument were in his possession, with its entire original validity." Nothing more is decided by the cases referred to, nor should the author be understood as asserting a broader or more comprehensive principle.

But if we are mistaken in this view of the question, there is one aspect of it that is conclusive, as to the right of the stockholders to rely upon the statute. A court of equity will, as a general rule,

Lex. L. F. & M.
Ins. Co. &c.
vs.
Page & Rich-
ardson.

only take jurisdiction and grant relief in cases where the instrument has been voluntarily delivered up, when the party has no legal remedy; and it is upon this ground alone that the court assumes jurisdiction, or interposes in his favor, even where the surrender of the instrument has occurred through mistake. Where a party has an adequate remedy at law, a court of equity will not entertain jurisdiction. (*Wanon's trustees vs. McKinney*, 1 *Marshall*, 479; *Williams & Burch vs. Dorsey*, 4 *Litt.*, 265; *Carlyle vs. Long*, &c., 5 *Litt.*, 167.)

Now, in this case, an action at law would have been maintained for the recovery of the dividends. In such an action the remedy would have been as full and complete as it could be made in a court of equity, on the ground that the notes, on which the dividends were applied as credits, had been delivered up and cancelled through mistake. In both courts the dividends would be the subject matter in controversy, and the recovery would be limited by their amount. The remedy therefore being complete at law, there could be no necessity for a resort to a court of equity. But conceding it to be a case of concurrent jurisdiction—which is all that can be contended for—and that a remedy might be had in either court, then the well settled doctrine would apply, that in such cases, when the remedy at law has been barred by the statute, the limitation will be inflexibly applied in a court of equity, precisely as it operates at law, with the single exception that it will not be allowed to operate in cases of fraud or mistake, until they have, or should have been, discovered. (*Gates and wife vs. Jacob*, &c., 1 *B. Monroe*, 306.)

But it is contended that no action at law could be maintained for the dividends which were credited upon the stock notes, and that such an action could only be maintained for those dividends which had been paid in money. There are, however, cases where money is considered as received or advanced, where it is not actually done. This is a case of that

LEX. L. F. & M.
INS. CO. &C.
*vs.*
PAGE & RICH-
ARDSON.

kind. The dividends were declared, and the stock-holders were, under the order of the board, entitled to the money. But as they still owed some part of their stock notes, they accepted a credit upon the notes, in lieu of the money. The transaction was substantially a payment of the money to the stock-holders, and a repayment of it by them, on their stock notes. This principle was recognized in the case of *Gray vs. Gray*, 2 *J. J. Marshall*, 22, in which it was decided that the plaintiff, who had surrender-ed a note to the defendant, which he held upon him, could, if the consideration upon which the note was surrendered had failed, maintain an action of as-sumpsit for money had and received, for the amount due upon the note at the time it was surrendered; the surrender of the note being deemed equivalent to the actual payment of the money. We are there-fore of the opinion that an action at law could be maintained for such dividends as were credited upon the stock notes, as well as for those that were paid in money, whenever the dividends so credited or paid were subject to reclamation.

Where the remedy is at law as well as in chancery, the chancellor ap-plies the statute of limitations.

The limitation of five years would bar the remedy at law; the statute must therefore have the same ef-fect and operation if the remedy be pursued in a court of equity.

We do not deem it necessary to decide whether the debts against the corporation, which some of the stockholders purchased after the execution of the deed of trust, could or not be rendered available as a set-off, in an action by the trustee for the recovery of the illegal dividends. No such action has been instituted, nor has the trustee asserted a claim to them in this action, in such a manner as to require it to be noticed by the stockholders. More than five years have elapsed since the last dividend was paid, and since the stock notes were surrendered to the stockholders. The claim is therefore barred by the statute of limitations, and consequently the validity of these debts as a set-off is immaterial. The trus-

tee, in his answer, prayed that he might be united with the plaintiffs, as a co-plaintiff in the action, and that the suit might progress in that form, so that if the dividends were illegal and he were entitled to them, the payment of them might be adjudged to him. But no such order was made, and if it had been made, the defendants would not have been bound to notice the claim, unless it had been asserted by an amended petition, upon which the service of process on them would have been necessary, inasmuch as the recovery of the dividends by him would have been based upon a different ground from that assumed by the original plaintiffs.

It is contended, however, that a *cestui que trust* may come into a court of equity, not only to enforce the trust itself, but also to compel the debtors of the assignor or grantor to pay their debts to the trustee, for the purposes of the trust; and to sustain this doctrine, the case of *Bixler's trustee vs. Taylor*, 3 *B. Monroe*, 362, is relied upon.

In that case the trustee had sold the trust property to a third person, and the object of the bill was to remove the trustee, and compel a surrender of the property to its proper custody. For that purpose it was decided that a court of equity had jurisdiction. The principle of that decision is obvious. The trustee had violated his duty and committed a breach of trust. On that ground the *cestui que trust* had a right to apply to a court of equity for relief. The same principle enables an heir or distributee to maintain a suit in equity for property belonging, or for a debt due to the estate, where the administrator or executor refuses to bring an action for it, or denies that the estate of his testator or intestate has any right to it. But that one beneficiary out of many, has a right to bring an action in his own name, against the debtors of the trust fund, without alledging any reason for bringing the action, except that he has an interest under the deed of assignment, is a position wholly untenable. Such a practice might lead to inextrica-

LEX. L. F. & M.
INS. CO. &C.
_vs._
PAGE & RICH-
ARDSON.

ble confusion, and an almost unlimited multiplicity of actions. If such an action can be maintained by one *cestui que trust*, of course the others have the same right, and yet none of them would have a right to collect the money, but only to have it paid over to the trustee. The trustee is the proper person to maintain the action, and none of the beneficiaries have a right to bring it in their own names, unless they show a sufficient reason for so doing. Under the Civil Code the trustee can bring the action, and prosecute it in his own name, without joining with him any of the beneficiaries, or making them parties to the action. He represents all the parties interested, and principle and convenience alike require that actions for debts due to the trust estate shall be brought by him, and not by any of the beneficiaries.

The plaintiffs did not, in their original or amended petitions, alledge that the trustee refused to bring suit for these dividends, or state any other ground upon which they claimed the right to sue for them, if the deed of assignment should not be vacated. On the contrary, in that event, they did ;not claim the right to sue for them, but expressly called upon the trustee to do it. They brought their action to vacate the assignment on the ground that it was fraudulent, and only claimed the right to have the dividends appropriated to the payment of their demand, if they succeeded in their effort to set aside the assignment. If they failed to accomplish that object, they admitted that the right to collect the claims which the company had against the stockholders for illegal dividends, passed to the trustee by the terms of the assignment, and they alledged that he was in duty bound to collect them, and called upon him to do it. Consequently they neither asserted a right to maintain an action for these dividends, if the deed of assignment were valid, nor did they alledge the existence of any ground that would have

enabled them to maintain it, if they had asserted a right to do so.

It has been contended in argument, that the trustee, by failing to bring suits for these dividends when called upon to do it, has violated the trust, and rendered himself liable for the amount of the dividends. We deem it only necessary to remark on this subject, that the pleadings do not contain any charge against the trustee of having violated his duty, nor has there been any litigation between the parties with respect to this matter in the court below, consequently the question attempted to be made in the argument, does not arise upon the record in this case, nor can we adjudicate upon it.

And as the right to the dividends passed to the trustee, under the' deed, it is not deemed necessary to decide whether the plaintiffs, as mere general creditors, not having obtained a judgment at law and an execution thereon with a return of *nulla bona*, could come into a court of equity for the purpose of having this fund applied to the payment of their demand. It is perfectly manifest, however, that they did not claim the right to do so on the ground that the corporation was dissolved, and for that reason an action at law could not be maintained against it. Neither their original petition, nor their amended petitions, contain any such allegations; but, on the contrary, the corporation is made a defendant, and proceeded against as being still in existence; and it cannot be admitted that a general assignment of all its property and effects in trust for the payment of debts, will, of itself, have the legal effect of producing a dissolution of a corporation.

But the plaintiffs, as beneficiaries under the deed, had a right to come into a court of equity to obtain their ratable part of the trust fund. The effort which they made to impeach the validity of the deed was rather repugnant to the claim they asserted to the benefit of its provisions. But this claim was only relied upon by them in the event of their failure

LEX. L. F. & M.
INS. CO. &C.
*vs.*
PAGE & RICH-
ARDSON.

to have the deed vacated as fraudulent; and as that object has not been accomplished, they have, in our opinion, a right to maintain their action for the enforcement of the trust, and the recovery of that portion of the trust fund to which they may be entitled. (*Repplier, &c. vs. Buck, Potter, &c.,* 5 *B. Mon.* 98.)

5. Beneficiaries in a deed of trust, having funds of the assignor in their hands, may retain, so far as is necessary to secure them for advances made, or personal liabilities incurred, as agent of the assignor, and liabilities incurred before notice of the assignment.

At the time the assignment was executed, the plaintiffs had in their hands a large amount of debts and securities which were the property of the company, and which passed to the trustee by the deed of assignment, subject, however, to the right of the plaintiffs to hold them as collateral security for the amount due to them by the company at the time they had notice of the assignment. After deducting therefrom the amount due to them at that time, the balance, if any, they must account for to the trustee. They have no right to retain it for the payment of subsequent advances, unless such advances were made in discharge of a previous personal liability, incurred by them for the company. Upon their subsequent collections they have a right to a reasonable compensation, which may be fixed at ten per centum, that being the commission which the company had agreed to allow them on their previous collections.

Wherefore, the judgment of the circuit court is reversed, and cause remanded, that a judgment may be rendered against the corporation for the debt due to the plaintiffs, and for further proceedings consistent with this opinion, whereby the amount of the trust fund to which the plaintiffs will be entitled may be ascertained, and its payment adjudged to them.