In re NATIONAL DISTILLERS AND CHEMICAL CORPORATION, A Foreign Corporation, now known as Quantum Chemical Corporation, Defendant/Appellant,

v.

Don W. STEPHENS, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta America Re Insurance Company, Plaintiff/Appellee.

No. 93–SC–784–CL.

Supreme Court of Kentucky.

Oct. 19, 1995.

As Modified on Denial of Rehearing Jan. 18, 1996.

Richard W. Iler, Merrill S. Schell, Wyatt, Tarrant & Combs, Louisville, Joseph P. Dailey, New York City, for Appellant/Plaintiff.

W. Henry Jernigan, Jr., Jacqueline Syers Duncan, Jackson & Kelly, Lexington, for Appellee/Defendant.

STUMBO, Justice.

The United States Court of Appeals for the Second Circuit, 6 F.3d 63, has requested certification pursuant to CR 76.37 of two (2) questions of law. The operative facts as set forth by the Second Circuit are as follows:

Delta America Re Insurance Company was a reinsurance company licensed and chartered under the laws of the Commonwealth of Kentucky. From its formation until it was sold on September 30, 1983, Delta was a wholly-owned subsidiary of National Distillers and Chemical Corporation, now known as

Quantum Chemical Corporation, a Virginia corporation that is the defendant in this action.

After the sale of Delta in 1983, Don Stephens, the Commissioner of Insurance for the Commonwealth of Kentucky (the Liquidator), petitioned the Franklin Circuit Court for an order declaring Delta insolvent and ordering its assets liquidated for the benefit of its creditors pursuant to the provisions of KRS 304.33–010, *et seq.* That order was granted on September 15, 1985. The fact of Delta's insolvency at the time of the order is not contested.

The Liquidator then commenced this action against Quantum alleging, among other things, that Delta's liabilities exceeded its assets as of December 31, 1980, and that at all times thereafter Delta was insolvent. According to the Liquidator, during this period Delta had no assets from which to lawfully declare dividends, yet notwithstanding this, paid Quantum $12,293,161.00 in dividends. The Liquidator claims that these dividends are properly assets of Delta, and are recoverable and applicable to Delta's outstanding indebtedness.

In answer to certain requests for admissions by the Liquidator, Quantum acknowledged that based upon claim information available at the time of its response, Delta's liabilities exceeded its assets during the 1984 year and each preceding year from 1980. Quantum, however, denied that from the years 1980 through 1983 Delta's "estimated" liabilities, as defined in KRS 304.6–040, exceeded its assets.

KRS 304.6–040(2) dictates that insurers such as Delta, in determining their financial condition, *estimate* the amount "necessary to pay all ... unpaid losses and claims incurred on or prior to the date of statement, whether reported or unreported, together with the expenses of adjustment or settlement thereof." The reporting and processing of claims arising from a single insured incident may string out over a period of several years, making it difficult to calculate the loss reserves which are reported as liabilities in the financial records of an insurance company. As a result, these reserve estimates may change as more information about the claim develops. For purposes of the motion giving rise to this appeal, it was stipulated that while Delta's estimates were in error, the errors were made in good faith.

Quantum contends that because Delta's good faith estimates of its loss reserves revealed a surplus at the time dividends were paid, the dividends were proper and cannot now be recovered, even though later information showed Delta to be insolvent at such time. The Liquidator argues that notwithstanding Delta's good faith, the controlling factor is *actual* insolvency, and that having received dividends not properly payable, Quantum must now relinquish such money for the benefit of policyholders and creditors.

The Franklin Circuit Court, on remand from the U.S. District Court for the Eastern District of Kentucky, agreed with the Liquidator and held on summary judgment that Quantum, as Delta's shareholder, was required to return the dividends which had been unlawfully paid. This decision, however, did not become final because while Quantum's motion for reconsideration was pending, the Sixth Circuit Court of Appeals reversed the order of remand. The action was returned to the Eastern District of Kentucky, which in turn transferred it to the Southern District of New York. A motion to reconsider and vacate the state court action was denied in the Southern District of New York, which refused to disturb the Franklin Circuit Court's interpretation of the issue of Kentucky law.

Quantum then appealed to the Second Circuit Court of Appeals which could find no controlling precedent on the issues of law presented and thus made this request for certification of law.

■ The specific questions presented to this Court are as follows:

(1) In determining whether dividends of a reinsurance corporation were properly paid under Kentucky law, can information received by the corporation after the date of payment be used to retroactively determine its financial condition at the time of payment?

(2) If the answer to question 1 is "yes," are shareholders of the reinsurance company directly liable for return of dividends paid during a period when the corporation was in fact insolvent, but the dividends were received in good faith?

We answer question 1 in the negative and therefore do not reach question 2.

At the heart of this matter is an issue of timing: whether the lawfulness of dividend distribution is to be determined at the time of payment or at some time later when additional financial information begins to surface. As we rule for the former, we likewise hold that so long as certain basic accounting principles and statutory requirements, explained below, are followed, retroactive evaluations play no role in ascertaining the legitimacy of any foregone dividend payments. Hindsight may be twenty-twenty, but the law turns a blind eye towards attempts to restate the financial condition of a corporation once that condition has already been lawfully determined.

Quantum contends, and we agree, that corporations must be entitled to rely upon generally accepted accounting principles to determine their financial posture. Any other method of evaluation would at the very least cause confusion among both participants in and observers of the financial world. As an example, we are directed to regulations articulated by the Securities and Exchange Commission, one in particular which states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate,...." 17 C.F.R. § 210.4–01(a)(1).

In addition to modern accounting principles, the Kentucky Insurance Code, KRS 304 et seq., directs insurers on how to evaluate their liabilities in order that dividends may be lawfully paid. While we caution that this opinion shall not serve as a treatise on "Accounting 101," certain provisions of the Code deserve highlighting. For example, KRS 304.3–240(2) requires insurers to file an annual financial statement in accordance with the requirements of the National Association of Insurance Commissioners. The NAIC requires insurers to follow statutory accounting principles, or SAP, a close cousin to generally accepted accounting principles, or GAAP. See Brief for Appellant, p. 9 & n. 18.

The Kentucky Insurance Code also speaks to how insurance companies may declare dividends and articulates standards as to how to evaluate an insurer's financial condition. KRS 304.24–320(1) requires that dividends be paid only from "surplus funds," defined in KRS 304.24–320(2) as "the excess of the insurer's assets over its liabilities,...." Liabilities are required by the Code be "*estimated* consistent with the provisions of subtitle 6, necessary to pay all of its unpaid losses and claims incurred on or prior to the date of statement,...." KRS 304.6–040(2). (Emphasis added). This provision tends to tame the nature of the beast in the insurance industry, namely that the full extent of an insurer's liability is difficult to grasp in light of the fact that certain claims may go unreported for several years, and some years may have an unusually high volume of claims. To this end, there are provisions in the Code, namely KRS 304.6–100(1), mandating that insurers maintain loss reserves "in an amount estimated in the aggregate to provide for payment of all losses and claims incurred, ... [and] computed ... upon reasonable consideration of the ascertained experience and the character of such kind of business."

The language of the Code is forward-looking and not backward-correcting. In other words, terms such as "estimated" and "ascertained experience" require insurers to gauge their financial positions based upon what has transpired in the past and what they expect to happen in the future. The idea that changes are to be made prospectively and not retroactively is implicitly contained within the language of KRS 304.6–100(2) which states that "[w]henever the loss and loss expense experience of the insurer show that reserves, calculated in accordance with such regulations, are inadequate, the commissioner may require the insurer to maintain additional reserves."

The Liquidator would have us believe that principles of accounting have no place next to

principles of law, and that once the smoke had cleared it was evident that Delta was insolvent at the time it had paid dividends. The issue, from the Liquidator's point of view, is not one of timing, but one of restitution: whether or not dividends mistakenly paid may be recouped. This, however, presupposes, and we believe in error, that a mistake was made in the evaluations of Delta's financial status. Our holding today underscores that where there is compliance with both GAAP and SAP, and with the relevant provisions of the Kentucky Insurance Code, there can be no error in evaluating the health of a company which would justify relinquishment of any dividends paid.

We are further unpersuaded by the Liquidator's argument that information regarding Delta's insolvency existed at the time dividends were paid, but that the company failed to discover it until later. The Liquidator seems to imply that the information regarding Delta's insolvency could have been discovered had only the directors perhaps used more diligence to uncover it. As set out in the Second Circuit's request for certification, it was a function of the insurance industry, not a result of mismanagement or malfeasance on the part of Delta, that the company's insolvency was not discovered at the time dividends were paid. As the Second Circuit recognized, "[t]he insolvency of Delta, and the failure to discover it earlier, stemmed primarily from the difficulty of calculating and monitoring the accuracy of loss reserves established by insurance companies." *Id.* at 65. Because, as counsel for Quantum noted, it may be fifteen to twenty years down the road before liability is incurred from a claim from a single incident, the estimate of the loss reserves affords the insurer with the best possible glimpse of its financial condition.

Finally, although we do not reach question 2 regarding a shareholder's duty to return dividends improperly received, it behooves us to speak on certain Civil War era case law which the Liquidator has chosen to argue on its behalf. In *Lexington Life, Fire and Marine Ins. Co. v. Page & Richardson*, 56 Ky. 412, 17 B.Mon. 412 (1856), the Court ordered dividends returned after directors of an insurance company had improperly ordered the payment of such dividends by mistakenly treating all premium payments as net profits without setting aside any reserves to pay future claims. The Liquidator mistakenly uses this case and the Court's focus therein on "actual profits," *Id.* at 440, to argue that dividends must be returned if paid at a time the company appeared to be solvent but really was insolvent. *Lexington Life*, however, differs from the case at bar in that in the former, the insurer utilized an improper method by which to evaluate its financial status, while in the latter, the insurer complied with what we hold to be the proper standards by which to determine the company's liabilities and assets. In addition, *Lexington Life* was rendered at a time before enactment of the statutory codes and corporation acts which provide guidance and regulations on financial reporting matters. Likewise, the Liquidator seeks to rely upon *Grant v. Ross*, 100 Ky. 44, 37 S.W. 263 (1896), in which the Court also required stockholders who had improperly received dividends to return the money. That case, however, is not completely on point in that in *Grant*, the shareholders of a railroad construction company were involved in a scheme to remove money from the reach of creditors. *See Grant v. Southern Contract Co.*, 104 Ky. 781, 47 S.W. 1091 (1898). Notwithstanding that fact, we feel reliance on such antiquated cases and the ancient common law is misguided in light of later-passed legislation and the evolution of modern accounting principles.

We find that as long as a reinsurance corporation follows GAAP, SAP, and the requirements of the Kentucky Insurance Code in determining its ability to declare dividends, information received subsequent to the distribution of dividends cannot be applied retroactively to determine the company's financial condition at the time of payment. As such, we need not address the merits of the second question.

STEPHENS, C.J., and LEIBSON, REYNOLDS and WINTERSHEIMER, JJ., concur.

LAMBERT, J., dissents by separate opinion, in which FUQUA, J., joins.

LAMBERT, Justice, dissenting.

In my view, the issue which should determine the outcome here is whether dividends declared and paid under the mistaken belief that an insurer is solvent may be properly retained by the shareholder/recipient or whether such dividends should be considered a mere windfall subject to recoupment upon discovery of insolvency at the time payment was made. Kentucky law has not heretofore spoken directly to this issue and as a result, this cause has been certified by the United States Court of Appeals for the Second Circuit.

It is unnecessary to belabor the point. I would adopt the analysis of the Franklin Circuit Court as follows:

To interpret the cited provisions of the Kentucky Revised Statutes in the manner advocated by NDCC would permit shareholders of a corporation to benefit from the mistakes of their managers at the expense of innocent creditors of the corporation.

.     .     .     .     .

To the contrary, while perhaps not directly on point, the statutes and relevant case law suggest that when called upon to balance the interests of the shareholders of an insolvent corporation such as Delta against the interests of that corporation's creditors, the interest of the latter are afforded preeminent protection. Thus, for example, under KRS 304.33–430, the claims of shareholders to the assets of the insolvent corporation are considered last, behind all other claimants, including unsecured creditors such as those who are here represented by the Liquidator. This priority scheme is consistent with that contained in the Federal Bankruptcy Act and other similar insolvency statutes. Given this pattern, the Court cannot accept the assertion that, in this instance, the shareholder, NDCC, is entitled to what amounts of money which would have been available to pay the debts of the insolvent but for estimates of liability which proved incorrect.

The Court is further persuaded by the rationale employed in the cases cited by the Liquidator. These cases make clear that a shareholder who receives part of a corporation's assets through an improper dividend has no right to it as against creditors of the corporation. Moreover, no wrong is done to the shareholder to require it to repay these monies where as here, they are required to pay the debts of its insolvent subsidiary.

.     .     .     .     .

The Court is not persuaded by this argument. The applicable statutes afford the directors of an insurance company ample protection in declaring a dividend provided they act reasonably in so doing. This decision requires nothing more than that the shareholder of an insolvent insurer return monies to the company which it would not have been entitled to if the true financial status of the company had been known when the purported dividends were paid.

Slip op. at 4–5 (citations omitted).

For the foregoing reasons, I dissent.

FUQUA, J., joins.